**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG**

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**                           **Criminal Case No.: 1:23-CR-12**

                                       **(JUDGE KLEEH)**

**JAJA KIAMBU FITZPATRICK,**

      **Defendant.**

**REPORT AND RECOMMENDATION RECOMMENDING THAT
DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 21] BE DENIED**

Pending before the undersigned Magistrate Judge is Defendant Jaja Kiambu Fitzpatrick's ("Defendant") Motion to Suppress Evidence [ECF No. 21], filed on August 16, 2023. By Referral Order dated August 16, 2023 [ECF No. 22], the Hon. Thomas S. Kleeh, Chief United States District Judge, referred the motion to the undersigned for conducting a hearing and entering a report and recommendation as to disposition of the motion.

The Court also is in receipt of the Government's response to Defendant's motion, filed on August 31, 2023. [ECF No. 24]. The undersigned conducted a hearing on Defendant's motion on September 15, 2023, at which the Court heard witness testimony and the arguments of counsel.

Based on a detailed review of Defendant's motion [ECF No. 21], the Government's response [ECF No. 24], and the testimony and argument given at the above-noted hearing, the undersigned **RECOMMENDS** that Defendant's motion be **DENIED** as set forth herein.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Defendant stands accused in a one-count indictment which a Grand Jury returned against him on March 7, 2023. [ECF No. 1].  Defendant is named in the Indictment with the offense of

Unlawful Possession of a Firearm, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(8), as a prohibited felon in possession of a firearm.

Defendant had been the subject of two law enforcement investigations in 2019 in Morgantown, West Virginia – (1) for a shooting incident that gave rise to an arrest warrant on an attempted first degree murder charge, and (2) for involvement in a drug trafficking operation. As to the former, the arrest warrant on the attempted murder charge, members of the Mon Metro Drug Task Force ("Task Force") and the United States Marshals Service ("USMS") located Defendant at an apartment on Luke Street in Morgantown, West Virginia on January 22, 2020. In the course of arresting Defendant, officers also relied on a search warrant for the apartment, which resulted from the drug trafficking investigation. The search warrant was issued by a state magistrate to search both the apartment and a nearby storage unit associated with the apartment. As part of that search, officers found a 9 mm pistol, which gives rise to the charge in the Indictment herein.

Defendant challenges the propriety of the search warrant issued by the state magistrate and, of course, the resulting recovery of the firearm in question. In particular, Defendant argues that the information on which the magistrate relied in issuing the search warrant was too stale to give rise to probable cause. Too much time had passed, Defendant asserts, between the last act on which the search warrant was based and the time of its issuance and execution.[1] The Government argues, however, that the totality of the information gleaned from the months-long drug trafficking investigation of Defendant is sufficient to support a finding of probable cause to issue the search warrant. In other words, according to the Government, the information on which the search warrant was gleaned was not stale, and that in fact the search warrant was well-supported. Thus, the

---

[1] The search warrant was executed on the same date it was issued. Defendant does not argue that officers delayed <u>execution</u> of the search warrant, but rather that the information on which the magistrate relied to issue it was too stale.

Government argues, the resulting search of the apartment and the resulting seizure of the firearm in question were lawful.

## II. SUMMARY OF TESTIMONY AND OTHER EVIDENCE

During the aforementioned suppression hearing on September 15, 2023, the Court heard sworn testimony from one witness, namely, Capt. James Beatty ("Capt. Beatty") of the Monongalia County (West Virginia) Sheriff's Department. Capt. Beatty is assigned to the Task Force, and the Government called him to testify as to the search warrant at issue.

### A. Capt. Beatty's Testimony

The testimony of Capt. Beatty was quite brief, and the Court received no exhibits into evidence. Principally, the parties make their arguments on the "four corners" of the search warrant, and to this end, the Court received arguments from counsel.

In particular, according to his testimony,[2] Capt. Beatty was involved in law enforcement's investigation of Defendant that gave rise to the application for the search warrant which Defendant challenges. [9:30:20 to 9:30:29]. Capt. Beatty prepared the search warrant (including the affidavit in support of it) for the search of the Luke Street apartment where Defendant was staying. [9:30:30 to 9:30:54]. Capt. Beatty presented the search warrant to a state magistrate for approval, and did so in person. [9:30:55 to 9:31:03]. According to Capt. Beatty, the magistrate reviewed the search warrant in his presence, and signed each page of the warrant materials including the warrant itself. [9:31:04 to 9:31:28]. The information set forth in the materials presented to the magistrate arose from the investigation of Defendant, in which Capt. Beatty and other officers were involved. [9:32:35 to 9:32:49].

---

[2] The citations here to times in brackets correspond to the times of the Court's archived audio recording of the suppression hearing on September 15, 2023, which is located on the section of the Court's intranet site for FTR recordings.

On cross-examination, Capt. Beatty stated that no information was shared with the magistrate beyond the information set forth in the search warrant and accompanying materials. [9:32:58 to 9:33:07]. Upon questioning by the undersigned, Capt. Beatty stated that the magistrate had him swear to the truthfulness and accuracy of the information presented therein. [9:33:08 to 9:33:41].

### B. The Search Warrant

The search warrant (with accompanying materials) in question is attached as the lone exhibit to Defendant's motion. [ECF No. 21-1]. It consists of a one-page form affidavit by which Capt. Beatty requested issuance of the warrant and swore to the same; a one-page form search warrant itself; a one-page Attachment 1-A and a one-page Attachment 1-B describing the substances (heroin and cocaine, respectively) and related items for which law enforcement intended to search; and Capt. Beatty's six-page affidavit setting forth his education, training, and experience, and the alleged facts arising from the drug trafficking investigation of Defendant and others.

By the latter – the six-page affidavit – Capt. Beatty sets forth the background for the request to search the Luke Street apartment. According to the affidavit, beginning on January 3, 2019, the Task Force was surveilling a residence in Morgantown (at 641 Brockway Avenue) as a result of anonymous tips of drug activity of the residence. Officers observed a person, who ultimately was learned to be Defendant, meet a person who was a suspected customer and then leave in a vehicle. Officers conducted an investigatory stop of the vehicle and learned of Defendant's identity.

Then, as set forth in the affidavit, on January 8, 2019, Task Force officers interviewed the suspected customer seen at 641 Brockway Avenue on January 3. This customer, identified as CI1 (for Confidential Informant 1), identified Defendant and others as being engaged in a conspiracy

4

to sell heroin. Also, on January 6, 2019, officers interviewed another confidential informant, CI5, who also detailed a conspiracy among Defendant and others to traffic drugs. When officers executed a search warrant of 641 Brockway Ave. on January 25, 2019, they found indicia of the selling of methamphetamine and heroin.

As further detailed in the affidavit, officers learned that those who were operating from 641 Brockway Ave. had relocated operations to 305 High Street. While observing 305 High Street on April 12, 2019, officers saw Defendant leave that location and go to the Luke Street apartment.

Relatedly, per the affidavit, law enforcement investigated a shooting at a Morgantown nightclub that occurred on April 14, 2019. In that incident, the shooter returned to 305 High Street afterwards. The Task Force executed a search warrant of 305 High Street on April 24, 2019, and discovered evidence of drug distribution activity as well as the firearm used in the shooting. Defendant was not present, although persons known to be Defendant's associates in the drug trade were present.

Then, as detailed in the affidavit, Task Force officers interviewed another confidential informant, CI12, who told them that Defendant was among those who were the source of a heroin supply in Morgantown. Task Force officers received similar information about how Defendant was a source of heroin in Morgantown from (a) an interview on July 22, 2019 with a confidential informant identified as C13, (b) an interview on August 23, 2019 with a confidential informant identified as CI14, and (c) an interview of September 19, 2019 with a confidential informant identified as CI15. As to the latter, CI15, officers relied on this information to establish that Defendant continued to sell heroin in a specific area, that being Pennsylvania Avenue.

Throughout this period, the confidential informants provided information about how Defendant used a mobile telephone to conduct drug trafficking activity. CI15 told officers the

specific number assigned to the mobile telephone which Defendant was using for that purpose. CI15 also told officers that while Defendant continued to engage in drug trafficking in Morgantown, he had been residing in the nearby city of Fairmont, West Virginia to escape detection by the Task Force.

Then, on November 17, 2019, as detailed in the affidavit, the Morgantown Police Department investigated another shooting, in the downtown area. In the course of the investigation, officers utilized both video surveillance footage and statements of witnesses in identifying Defendant as the shooter. Then, on November 22, 2019, officers with the Task Force interviewed CI15 again. From CI15, officers learned that in prior weeks, Defendant had continued selling heroin, as well as crystal methamphetamine and cocaine. CI15 described the two vehicles Defendant had been using, said they had seen Defendant sell methamphetamine to a female near the Luke Street apartment, and said that Defendant was residing at the Luke Street apartment. CI15 also provided information about how Defendant was utilizing a mobile telephone with the number which CI15 previously provided, but also that Defendant had a new number. CI15 provided that new number. CI15 also provided information about how they had seen Defendant carry a firearm.

On November 25, 2019, an officer met with CI15 to have CI15 place a recorded call to Defendant at the new telephone number. Defendant agreed to sell a quantity of heroin to CI15, using an intermediary named Ivan Nelson ("Nelson") to deliver the heroin to CI15. After delivering the heroin, Nelson returned to the Luke Street apartment.

On November 16, 2019, a Task Force officer procured records pertaining to Defendant's new phone number. Information gleaned from the records showed contact (1) with users of heroin known to the Task Force, (2) with Nelson, and (3) with other numbers originating in the Detroit, Michigan area from where Defendant was known to have travelled.

On December 5, 2019, Task Force officers arrested Nelson, who possessed bulk quantities of heroin and crack. Then, in early January 2020, the Morgantown Police Department engaged USMS to arrest Defendant. Law enforcement then began searching for Defendant. On January 12, 2020, CI15 provided information to the Task Force that Defendant had returned to Morgantown to traffic in cocaine and heroin. CI15 stated that Defendant was staying at the Luke Street apartment. Finally, according to the affidavit, on January 22, 2020, USMS personnel provided information to the Task Force that GPS data showed Defendant's mobile telephone to be located at Luke Street.

### C. Defendant's Arrest and Search of Luke Street Apartment

To clarify, from the review of the record, it appears that the arrest of Defendant on January 22, 2020 was pursuant to an arrest warrant issued for the shooting in downtown Morgantown in November 2019. The search of the Luke Street apartment and associated storage unit was conducted pursuant to the above-summarized search warrant issued by the state magistrate. It was this search which yielded the 9 mm pistol in the storage unit. That 9 mm pistol gives rise to the Indictment of Defendant herein, for being a felon in possession of a firearm.

### III. LEGAL ISSUES AND ANALYSIS

Defendant contends that the information on which the probable cause statement was based in issuing the search warrant was too distant in the past, such that it was stale and no probable cause for the search existed. Defendant stresses that the last-known information to the Task Force was provided in November 2019, and that additional information about Defendant's return to Morgantown to traffic drugs was provided weeks later, on January 12, 2020. Defendant argues that not only was the substantive information too stale, but also that the information provided on January 12, 2020 was too paltry to give rise to probable cause for a search warrant. What is more,

Defendant emphasizes, law enforcement did not seek a search warrant for 10 more days, on January 22, 2023.

On the contrary, the Government argues that the passage of time is not so great as to have rendered the information stale, especially taken in context with the lengthy investigation of Defendant and the aggregation of information over that time concerning his alleged drug trafficking activity. The long arc of the investigation of Defendant obviates any concern about a lull of activity in the case of only a few weeks. And even if Defendant is correct on this point, the Government asserts, the "good faith exception" to the exclusionary rule applies to salvage the search warrant.

### A. Legal Principles

As a foundational matter, the undersigned notes the well-established principle that the Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Moreover, "the general rule [is] that every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause." Michigan v. Summers, 452 U.S. 692, 700 (1981).

"Probable cause" is not defined easily, but the Supreme Court has explained that it may be found in the "totality of circumstances" such that:

> [t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed.

Illinois v. Gates, 462 U.S. 213, 238–39, 103 S. Ct. 2317, 2332, 76 L. Ed. 2d 527 (1983) (citation and quotations omitted).

Moreover, "it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" Mincey v. Arizona, 437 U.S. 385, 390 (1978) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). It is the Government's burden to demonstrate that one of these exceptions applies. Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971). Among those few exceptions to the requirement to obtain a warrant is the "good faith" exception. Under this principle, if officers rely in good faith on a search warrant that later is found to be invalid, the fruits of the search may nonetheless be used at trial. United States v. Leon, 468 U.S. 897, 922-923 (1984).

Finally, a well-established principle is that of the exclusionary rule. This rule holds that a court should exclude evidence obtained by dint of law enforcement's unlawful arrest or search. See Mapp v. Ohio, 367 U.S. 643 (1961). Relatedly, however, a court should suppress evidence in a criminal matter "only … where its deterrence benefits of exclusion outweigh its substantial social costs." Hudson v. Michigan, 547 U.S. 586, 591 (2006) (citations and quotations omitted).

### B. Analysis

In the case at bar, the relatively brief lull in the investigation of the alleged drug trafficking activity, in the weeks prior to issuance of the search warrant, is not fatal to the search warrant. And even if the search warrant was improperly issued, the Leon good faith exception salvages it.

On the question of staleness of information to support probable cause for a search warrant, the Fourth Circuit has instructed:

> Cases in which staleness becomes an issue arise in two different contexts. First, the
> facts alleged in the warrant may have been sufficient to establish probable cause

when the warrant was issued, but the government's delay in executing the warrant possibly tainted the search. Second, the warrant itself may be suspect because the information on which it rested was arguably too old to furnish "present" probable cause. A reviewing court's task in each category of cases is slightly different. In testing a warrant in the first category, it must decide whether a valid warrant became invalid due to the lapse of time; when considering those in the second category, it must determine whether information sufficient to constitute probable cause was ever presented. The court's fundamental concern, however, is always the same: did the facts alleged in the warrant furnish probable cause to believe, at the time the search was actually conducted, that evidence of criminal activity was located at the premises searched?

United States v. McCall, 740 F.2d 1331, 1336 (4th Cir. 1984) (citations omitted). The McCall court noted that, particularly in the context of ongoing criminal enterprises, probable cause can continue to lie even when there are gaps between when illegal activity is observed and the time when the search warrant is issued. Id.

In support of his "staleness" argument, Defendant maintains that the information reflected in the affidavit does not show Defendant to have been selling drugs from the Luke Street apartment itself. And Defendant further argues that it is not always certain, from the affidavit, where CIs got their information about Defendant or that Defendant himself consistently possessed or sold drugs. As such, Defendant contends, the information in the affidavit (from November 2019) is rendered even more "stale." The information from November 2019 should not have been used to bolster the information gleaned in January 2020 about Defendant having returned to Morgantown to sell drugs and staying at the Luke Street apartment.

To be certain, even the Government says that the information provided by C15 in January 2020 is not enough, standing alone, to establish probable cause for issuance of a warrant to search the Luke Street apartment. Rather, the Government emphasizes, correctly, that Defendant had been connected to the Luke Street apartment repeatedly over the preceding several months. Defendant and others with whom he was known to associate, as learned in the course of the Task Force

investigation, returned to the Luke Street apartment on multiple occasions after allegedly conducting drug transactions and/or being observed at locations where drugs were being distributed. Moreover, the source of the CIs' information is not doubtful, in that the CIs' information appears to have constantly corroborated what law enforcement was observing and learning about Defendant through the course of the investigation otherwise. And while Defendant may not have made a practice of selling drugs in the Luke Street apartment itself, C15 gave information to the Task Force about Defendant selling drugs nearby that apartment.

Taken in a commonsense context, the magistrate who issued the search warrant could well have found probable cause in support of the warrant. Over the course of several months, the Task Force threaded together a series of observations, tips, and conversations showing Defendant's repeated alleged involvement in drug trafficking in concert with other persons in the locale. Since January of 2019, Defendant had been known to the Task Force to be an integral figure in the drug trafficking network. Thus, it stands to reason that the dwelling which Defendant and his associates were known to frequent may well house evidence of drug trafficking activity. After all, as the Government notes, the attachments to the search warrant, Attachments 1-A and 1-B, show that law enforcement was looking not only for drugs but also for related evidence such as weapons, packing material, currency, etc. The magistrate could have reasonably inferred that drugs and other such items may well be found at the Luke Street apartment. See United States v. Jones, 942 F.3d 634, 638 (4th Cir. 2019).

That there was a period of inactivity in the investigation from November 2019 to January 2020 is of no moment. In context of the monthslong investigation of Defendant, and all of the activity in which Defendant is alleged to have engaged in that period, this is a relatively short span of time. The information of which Defendant complains was not stale. Defendant was observed to

have engaged in consistent activity in the Morgantown area from January to November of 2019. There was no indication whatsoever that Defendant simply ceased that activity in November of 2019. Given the totality of officers' observations over the preceding months, Defendant might reasonably have been expected to have come to their attention at any point in late 2019 or early 2020. This is just the type of gap in time which the <u>McCall</u> court contemplated as <u>not</u> being an impediment to finding probable cause.

On a separate note, even if probable cause was lacking, the <u>Leon</u> good faith exception salvages the officers' reliance on the search warrant in conducting the search. Under <u>Leon</u>, there are four circumstances where good faith will operate to save a deficient warrant:

> [1] if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth . . . [2] [if] the issuing magistrate wholly abandoned his judicial role . . . [3] [if the] warrant [is] based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable . . . [and if] [4] a warrant [is] so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.

<u>Leon</u>, 468 U.S. at 923 (citations and quotations omitted). Here, Defendant seems to invoke the third exception to <u>Leon</u> – that the warrant was so lacking in indicators of probable cause that it was unreasonable for the magistrate to rely on the affidavit. However, as set forth in the analysis above, the affidavit is hardly lacking in detailed, substantive content. The affidavit demonstrates the length of the investigation involving Defendant, which was punctuated by regular and ongoing observations and other points of information concerning the drug trafficking network and other criminal activity in which he is alleged to have been involved. Nothing in the record and nothing resulting from the suppression hearing before the undersigned indicates anything other than meaningful, careful composition (and magistrate's review) of the affidavit.

Therefore, to the extent the warrant may otherwise be deemed insufficient (which, to be clear, the undersigned does not find herein), the <u>Leon</u> good faith exception saves it.

### IV. CONCLUSION

For the reasons set forth herein, the undersigned **FINDS** that the search warrant at issue was <u>not</u> deficient, and thus **RECOMMENDS** that Defendant's Motion to Suppress [ECF No. 21] be **DENIED.**

Any party may, **on or before October 4, 2023**,[3] file with the Clerk of this Court, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.**  A copy of such objections should also be submitted to the United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12.

**Failure to timely file written objections to the Report and Recommendation as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** <u>Snyder v. Ridenour</u>, 889 F.2d 1363 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

The Clerk of Court is **DIRECTED** to transmit copies of this Report and Recommendation to counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

---

[3] Although parties usually have 14 days to respond to a Report and Recommendation such as this, that is a maximum time to respond, not a minimum. In this matter, the pretrial conference is scheduled for October 11, 2023 and the jury selection and trial for October 30, 2022.

Respectfully submitted September 27, 2023.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE